**SUN CITY COMMUNITY HOSPITAL, INC., d/b/a Walter O. Boswell Memorial Hospital**

v.

**The UNITED STATES.**

No. 545–78.

United States Court of Claims.

May 28, 1980.

Arthur P. Allsworth, Phoenix, Ariz., attorney of record, for plaintiff. O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A., Phoenix, Ariz., of counsel.

Kenneth R. Melvin, Washington, D.C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant. Jerry J. Bassett, of counsel.

Before KASHIWA, KUNZIG and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge:

This is an action for the recovery of Medicare reimbursements for plaintiff's 1971 and 1972 fiscal years. The case is before the court on the parties' cross motions for summary judgment. Plaintiff asks us to find it entitled to additional Medicare reimbursements of $19,204 for 1971 and $27,846 for 1972. Defendant asks us to find plaintiff entitled to no additional reimbursements. As explained in more detail *infra*, a Hearing Officer initially held plaintiff entitled to additional reimburse-

ment. The Hearing Officer was then ordered to reopen and revise his decision. In accordance with this directive, the Hearing Officer rendered a second decision in which he held plaintiff entitled to no additional Medicare reimbursement. For the reasons set out below, we accord finality to the first decision and grant plaintiff recovery, but not in the full amount requested.

Plaintiff is a nonprofit corporation organized under the laws of the State of Arizona, has a fiscal year ending June 30 of each calendar year, and operates the Walter O. Boswell Memorial Hospital. Plaintiff participates in the Medicare program as a "provider," in accordance with Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (1970). Pursuant to an agreement filed with the Secretary of Health, Education and Welfare ("HEW") under 42 U.S.C. § 1395cc, a provider agrees not to charge Medicare beneficiaries directly for services furnished to them, agreeing instead to be reimbursed from the Medicare fund for such services.

■ To the extent here relevant, 42 U.S.C. § 1395f(b) provides that the reimbursement will be equal to the "reasonable cost," as defined in 42 U.S.C. § 1395x(v), of providing such services. "The reasonable cost of any services shall be determined in accordance with regulations establishing * * * the items to be included, in determining such costs for various types or classes of institutions * * *." 42 U.S.C. § 1395x(v)(1). The regulations so authorized are now set out at 42 C.F.R. § 405.101 *et seq.* (1979).[1] 42 C.F.R. § 405.415(a) provides that "[a]n appropriate allowance for depreciation on buildings and equipment used in the provision of patient care is an allowable cost." This means an appropriate allowance for depreciation is considered one of the reasonable costs of providing services to Medicare beneficiaries. An amount equal to such allowance is, therefore, included in and increases a provider's Medicare reimbursement.

Sometime prior to 1971, plaintiff chose Blue Cross Association of Illinois ("BCA") to act as its fiscal intermediary. BCA in turn had Blue Cross of Arizona, Inc. (The "Plan") assume, in the first instance, the obligation to service plaintiff. Under plaintiff's agreement with HEW and also pursuant to 42 U.S.C. § 1395h, BCA and the Plan were required to determine the amount of Medicare reimbursement due, and make actual payment to, plaintiff. This in turn required the Plan and BCA to determine plaintiff's reasonable cost of providing services to Medicare beneficiaries.

Plaintiff's hospital was constructed in the late 1960's. Although there is disagreement as to the motive for doing so, it is undisputed that the general contractor, Del E. Webb Corporation ("Webb"), agreed to forego its usual overhead and profit markup on this construction project. When the hospital facility was completed, it was appraised by a nationally recognized appraisal company. The appraisal indicated the hospital had a date-of-completion fair market value of $5,329,451. The actual cost to plaintiff of constructing the facility was $576,114 less than such fair market value.

Plaintiff took the position that Webb, the subcontractors, and the architect who worked on the hospital facility all made donations of services to plaintiff to aid in plaintiff's acquisition of its hospital. In plaintiff's view, Webb's donation was its not charging an overhead and profit markup; and the subcontractors and architect made their donations by agreeing to work for less than their normal rates of profit. Plaintiff also assumed the $576,114 difference between fair market value and cost was entirely attributable to, and equaled the total amount of, these various donations. Operating under the assumption that in determining the appropriate allowance for depreciation donations could be added to basis, plaintiff increased its basis in the facility by this amount. This in turn increased the allowance for depreciation

---

1. During the years in issue, these regulations were located at 20 C.F.R. § 405.101 *et seq.* No substantive change having occurred when re-designation to 42 C.F.R. occurred, we shall in this opinion, for the sake of convenience, refer to the regulations as contained in 42 C.F.R.

and, thus, also the reasonable cost of providing services to Medicare beneficiaries by $19,204 for its fiscal year 1971 and $27,846 for its fiscal year 1972.

The Plan determined that none of the $576,114 could be included in plaintiff's basis for its hospital facility. It, therefore, reduced plaintiff's Medicare reimbursement by $19,204 and $27,846 for fiscal 1971 and 1972, respectively. Plaintiff appealed this decision to BCA and a hearing was conducted by BCA's Chief Hearing Officer. Plaintiff was the only party to offer evidence and testimony at the hearing.

In determining plaintiff's basis in its hospital facility for purposes of determining the appropriate allowance for depreciation, the Hearing Officer looked to the Provider Reimbursement Manual (the "Manual").[2] The Hearing Officer interpreted Manual section 104.15 as articulating a general rule that *for Medicare reimbursement purposes,* a provider can acquire an asset either entirely by purchase or entirely by donation, but cannot acquire a single asset partially by purchase and partially by receipt of donations. If the provider makes any payment in obtaining an asset, even if the asset was in fact donated in part, the asset is considered acquired entirely by purchase and the donation treated as if it never occurred.[3] Since not recognizable, the value of the donation cannot be added to the basis of such asset, limiting the basis to the provider's cost of acquisition. However, he then went on to interpret Manual section

134.6 as creating an exception to this general rule.[4]

The Hearing Officer viewed the first sentence of the second paragraph of section 134.6 as stating that where a provider constructs an asset and in fact receives a donation of material, labor, or services in conjunction with such construction, the donation is recognizable for Medicare purposes and the asset's basis includes both the fair market value of such donation as well as the cost actually incurred by the provider. The Hearing Officer then interpreted the first paragraph of Manual section 134.6 as authorizing the use of an appraisal to determine the fair market value of the donated material, labor, or services.

Finally, he derived tangential support from Manual section 806 for his reading of Manual section 134.6.[5] In the Hearing Officer's view, under section 806 had Webb, the subcontractors, and the architect charged plaintiff the full price for their services and then made a cash donation of all or part of their profits, plaintiff's basis would not be reduced by such donation. He, therefore, found no reason why a donation in the form of material, labor, or services could not be directly recognized in basis.

Turning to the facts of this controversy, the Hearing Officer found plaintiff had acquired its hospital facilities through its construction of them, making this Manual section 134.6 exception available. He then found that of Webb, the subcontractors,

---

2. The Provider Reimbursement Manual (HIM–15) is a set of general instructions issued by the Health Care Financing Administration of HEW in accordance with the Secretary of HEW's agreement with its intermediaries. The Manual was promulgated as an aid in interpreting the Medicare regulations, 42 C.F.R. § 405.101 *et seq.* The Manual is not, however, an administrative regulation. *Fairfax Nursing Center, Inc. v. Califano,* 590 F.2d 1297 (4th Cir. 1979).

3. The Hearing Officer found support for this in the statement: "An asset is considered donated when the provider acquires the asset without making any payment for it in the form of cash, property, or services." Manual section 104.15.

4. Manual section 134.6 provides in relevant part as follows:

"Where the Provider's records do not contain the fair market value of donated assets as of the date of donation, an appraisal of such fair market value on the date of donation by the appraisal expert will be acceptable for depreciation and owner's equity capital purposes.

"Where material, labor, and services are donated in the construction of an asset, the asset value is the sum of the appraised cost of the material, labor, or services actually donated and the incurred cost of that part which was not donated. * * *"

5. As will be discussed *infra,* Manual section 806 is not at all relevant to resolution of this case. The text of this provision is for this reason not set out.

and the architect, only Webb had in fact made a donation to aid plaintiff in the construction of its hospital and that this was a donation of services in the form of Webb's waiving its usual markup for overhead and profit. As a consequence, he allowed plaintiff to include in its basis for determining allowable depreciation on the hospital the appraisal-determined fair market value of such donated services.

Plaintiff subsequently established by appraisal that the fair market value of Webb's donation was $550,055.64. The Hearing Officer then allowed plaintiff to increase its basis in the hospital by this amount. Since the Hearing Officer was acting on behalf of BCA, the Hearing Officer's action constituted a hearing decision rendered by BCA itself.

After this basis increase was allowed, HEW's Social Security Administration's Bureau of Health Insurance ("BHI") ordered the Hearing Officer to reopen and revise his decision. BHI relied upon 42 C.F.R. § 405.-1885(b) as authority for its taking such action.[6] While this regulation does allow BHI to order an intermediary to reopen and revise its decision, BHI can do so only if the determination or decision of the intermediary (here BCA) "is inconsistent with the applicable law, regulations, or general instructions issued by the Health Care Financing Administration in accordance with the Secretary's agreement with the intermediary."

As a result of being ordered to reopen and revise his decision, the Hearing Officer did so and decided none of the $550,055.64 could be added to the basis of the hospital. He also reinstated the Plan's original decision restricting plaintiff's basis for determining allowable depreciation to plaintiff's actual cost of constructing the hospital facility.

The parties have stipulated that increasing the basis by $550,055.64 above plaintiff's actual cost of constructing the hospital would increase the allowance for depreciation by $18,335.35 for fiscal 1971 and $26,586.53 for fiscal 1972. This would in turn increase plaintiff's reasonable cost and, hence, also its Medicare reimbursements by these same amounts in these two years.

■ Since plaintiff limited its requested relief to fiscal 1971 and 1972, there is no question that we have subject matter jurisdiction under 28 U.S.C. § 1491 (1976).[7] Our scope of review is well settled and is in part limited to reviewing decisions by a Hearing Officer to ensure such decisions' compliance with the Constitution, statutory provisions, and regulations having the force and effect of law. E. g., Sacred Heart Hospital v. United States, 616 F.2d 477 (Ct.Cl.1980); Gosman v. United States, 215 Ct.Cl. 617, 621–622, 573 F.2d 31, 34 (1978). Our scrutiny is analogous to the review of administrative decisions in Government contract cases under the Wunderlich Act, 41 U.S.C. §§ 321–322 (1976). Gosman v. United States, id., at 622, 573 F.2d at 34; Overlook Nursing Home, Inc. v. United States, 214 Ct.Cl. 60, 66, 556 F.2d 500, 502 (1977). Accordingly, in Medicare controversies we give finality to a Hearing Officer's decision only if it is in compliance with the Constitution, statutory provisions, and regulations having the force and effect of law.

The Hearing Officer rendered two separate decisions. In the first decision, he held

6. 42 C.F.R. § 405.1885(b) provides in relevant part as follows:

"(b) A determination or a hearing decision rendered by the intermediary shall be reopened and revised by the intermediary if * * * such determination or decision is inconsistent with the applicable law, regulations, or general instructions issued by the Health Care Financing Administration in accordance with the Secretary's agreement with the intermediary."

7. The only way we could possibly not have jurisdiction is if plaintiff was required to comply with the review procedure set out in 42 U.S.C. § 1395oo (1976). This statutory provision is, however, applicable only with respect to accounting periods ending on or after June 30, 1973. By limiting is requested relief to fiscal 1971 and 1972 and by being on a June 30 fiscal year, plaintiff's motion is with respect to accounting periods ending on June 30, 1971, and June 30, 1972. The present controversy therefore concerns accounting periods prior to the effective date of 42 U.S.C. § 1395oo, making it inapplicable.

plaintiff's basis in its hospital could properly be increased by $550,055.64. In the second, which superseded the first decision and which was rendered only after the Hearing Officer was ordered by BHI to reopen and revise the first decision, he held the $550,055.64 could not be added to plaintiff's basis.

■ *Sacred Heart Hospital* involved the identical situation. In that case, a BCA Hearing Officer rendered one decision and was then ordered by BHI to reopen and revise this decision. As a result, a second decision was then rendered. BHI's action was there also taken pursuant to 42 C.F.R. § 405.1885(b). Focusing on limited authority conferred on BHI by this regulation, this court held the ordering of reopening and revision, and hence also the second decision, could stand only if the Hearing Officer's original decision was inconsistent with the applicable law, regulations, or general instructions issued by the Health Care Financing Administration. If there was not such inconsistency, then BHI in fact had no authority to order reopening and revision, and the Hearing Officer in turn had no authority to set aside the first decision and enter a subsequent decision in its place. As such, the second decision would not be in compliance with the authority conferred by 42 C.F.R. § 405.1885(b). In this event, the second decision must be set aside by this court and the Hearing Officer's original decision treated as his final decision.[8]

Relying in our case on *Sacred Heart Hospital*, the Hearing Officer's second decision will stand only if his first decision is inconsistent with the law, regulations, or general instructions. If it is not inconsistent, then we will set aside the second decision and give finality to the first.

BHI asserted that for the following reasons the first decision was inconsistent with the law, regulations, or general instructions:

(1) Manual section 104.15 mandated that where a provider makes any payment in acquiring an asset, even if a donation of material, labor, or services in fact occurred, such donation is not recognizable for Medicare purposes; the first sentence of the second paragraph of Manual section 134.6 creates no exception to this rule in the case of assets constructed by the provider. The Hearing Officer erred in interpreting section 134.6 as articulating such an exception.

(2) The first paragraph of Manual section 134.6 allowing use of appraisals to establish the fair market value of a donation is subject to the general restriction on use of appraisals set out in Manual section 134.2.[9] In addition, plaintiff's historical cost records were complete and reliable. Assuming for argument sake that Webb had in fact made a donation and such donation was recognizable for Medicare purposes, Manual section 134.2 thus overrode section 134.6 and prohibited plaintiff from using an appraisal to deter-

---

8. Our having jurisdiction to determine whether to set aside such second decision, and in appropriate cases to do so and reinstate the Hearing Officer's first decision, is an extension of our general subject matter jurisdiction in Medicare cases. *Sacred Heart Hospital, supra; Gosman, supra.*

As previously discussed, this court's scope of review includes examination of a Hearing Officer's decision to ensure compliance with regulations having the force and effect of law and setting the decision aside if not in compliance. Since 42 C.F.R. § 405.1885(b) was one of the regulations promulgated pursuant to the delegation of authority under 42 U.S.C. § 1395x(v)(1), it is a regulation having the force and effect of law. We, thus, have the jurisdiction to determine whether the second decision

complied with this regulation. Since the second decision would comply only if the first decision was inconsistent with the applicable law, regulations, or general instructions, we of necessity also have the jurisdiction to examine the first decision to determine whether it was "inconsistent."

If the second decision is set aside for "non-compliance," the first decision has, in legal effect, not been superseded and is therefore enforced as the decision of the Hearing Officer.

9. Manual section 134.2 provides in relevant part as follows:

"An appraisal for program purposes should be made only where the provider has no historical cost records or has incomplete records of the depreciable fixed assets. * * *"

mine the fair market value of Webb's donation. The Hearing Officer erred in allowing the use of an appraisal to determine the amount of Webb's alleged donation.

(3) There was nothing in the Hearing Officer's decision to support the finding that Webb in fact made a donation to plaintiff.

(4) The Hearing Officer erred in ignoring 42 C.F.R. § 405.415(b), which states that "[h]istorical cost is the cost incurred by the present owner in acquiring the asset."

(5) The Hearing Officer erred in relying on Manual section 806. This provision only applies to actual payments made to the provider. It is undisputed that Webb made no actual payment to plaintiff.

Our task is, therefore, to determine whether any or all of these above-listed assertions are correct and if so, renders the first decision inconsistent with the law, regulations, or general instructions. We address these points in the same order as presented above.

■ BHI's first objection has no merit and creates no "inconsistency" in the first decision. The first sentence of the second paragraph of Manual section 134.6 clearly indicates that where a provider itself constructs an asset, it can acquire such asset partially by purchase and partially through receipt of donations of material, labor, or services. We also recognize that section 104.15 literally provides that "[a]n asset is considered donated [only] when the provider acquires the asset without making any payment for it in the form of cash, property, or services." If we were to read both Manual sections literally, there would therefore be a conflict between the two where assets are constructed by the provider. Manual section 134.6 would allow such assets to be donated in part; Manual section 104.15 would not.

The best way to resolve this apparent conflict is to interpret section 134.6 as creating in the case of constructed assets an exception to the "no partial donation" rule of section 104.15. We find support for this

in that section 134.6 is a specialized provision dealing only with constructed assets, whereas section 104.15 is a provision of general application, applying to *all* assets acquired by the provider. The general rule of interpretation is that general terms yield to more specific ones. *See Abell v. United States*, 207 Ct.Cl. 207, 224, 518 F.2d 1369, 1378 (1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976); 1A Corbin, Contracts § 547 (1963 and Supp. 1971). In addition, reading this exception into section 104.15 will allow both sections to be read harmoniously with one another and will give a reasonable meaning to both. This should be our goal whenever we are compelled to resolve an apparent conflict between provisions contained in the same manual. *See, e. g., Mason v. United States*, 615 F.2d 1343 (Ct.Cl.1980); *Bishop Engineering Co. v. United States*, 180 Ct.Cl. 411, 416 (1967).

■ We, therefore, hold the Hearing Officer correctly interpreted the Manual in ruling that section 134.6 created an exception to section 104.15. In addition, although not directly challenged by BHI, relying on Manual section 102 we also agree that whenever a provider receives a donation of material, labor, or services, the fair market value of such donation is included in the basis of the constructed asset for depreciation purposes.

Manual section 102 sets out the general principles to be followed in determining the provider's allowance for depreciation. This provision states in part as follows: "An appropriate allowance for depreciation on buildings and equipment is an allowable cost. *The depreciation must be * * * based on the historical cost of the asset or fair market value at the time of donation * * * in the case of donated * * * assets * * *.*" [Emphasis supplied.]

This emphasized portion of section 102 which provides that basis is equal to the historical cost in the case of an asset acquired by purchase *or* fair market value in the case of a donated asset merely reflects the general rule, as expressed in section 104.15, that a single asset can be acquired

either by purchase *or* donation, but not by a combination of the two. However, section 134.6 is an exception to this general rule and provides that constructed assets can be acquired partially by purchase and partially through donation. In light of this exception, in the case of constructed assets it is logical to interpret the "or" in section 102 as an "and." Such an interpretation is the only adequate way to effectuate the purpose of this section 134.6 exception. *See, e. g., Peacock v. Lubbock Compress Co.,* 252 F.2d 892 (5th Cir.), *cert. denied,* 356 U.S. 973, 78 S.Ct. 1136, 2 L.Ed.2d 1147 (1958). Therefore, in the case of an asset constructed by the provider, the basis for depreciation purposes equals the sum of the historical cost of that portion of the asset acquired by purchase plus the fair market value of that portion acquired by donation.

■ BHI's second objection also is without merit. While we agree that section 134.2 allows the use of an appraisal only where the provider either has no historical cost records or incomplete historical cost records, it is important to note the limited scope of this provision. Historical cost is the amount incurred by a provider when it acquires an asset by *purchase.* Section 104.10.[10] As such, section 134.2 only places a limitation on the use of an appraisal to determine the provider's cost of those depreciable fixed assets acquired by purchase. Where the provider has complete and accurate records of the cost of a purchased asset, such cost cannot be determined through use of an appraisal. However, section 134.2 does not at all deal with use of an appraisal to determine the fair market value of an asset, or part thereof, obtained through receipt of a donation.

■ The first paragraph of section 134.6 does, however, authorize the use of an appraisal for depreciation purposes "[w]here the Provider's records do not contain the

fair market value of donated assets as of the date of donation * * *." Here, assuming a donation of material, labor, or services had been made, in the absence of an appraisal plaintiff would not know how large a donation it had receive and its records could, therefore, not have contained therefore, not have contained the fair market value of such donation. Section 134.6 would thus allow plaintiff to use an appraisal to fix the fair market value of any donations it received in connection with the construction of its hospital facility. Since section 134.2 is no bar to plaintiff's use of an appraisal to ascertain the fair market value of donations, and section 134.6 specifically authorized such use of appraisals, we agree with the Hearing Officer's decision that plaintiff could use an appraisal to determine the fair market value of any donated material, labor, or services.

■ A hearing was held prior to rendering the first decision. It is undisputed that plaintiff was the only party to present evidence and testimony. Based upon this evidence and testimony presented to him, the Hearing Officer held Webb had in fact made a donation to plaintiff equal in amount to the fair market value of the waived overhead and profit markup. We can safely assume that at least some of the evidence presented by plaintiff was favorable to plaintiff's own position. In light of this, we find no merit in BHI's argument that there was nothing in the Hearing Officer's decision to support his finding that Webb made a donation.

■ Regarding BHI's fourth objection, whether the Hearing Officer ignored 42 C.F.R. § 405.415 is completely beside the point. This regulation section defines historical cost. As we have previously indicated, historical cost is the cost incurred in acquiring an asset by *purchase.* The Hearing Officer was dealing with the impact on

10. Manual section 104.10 provides in relevant part as follows:

"Historical cost is the cost incurred by the present owner in acquiring the asset and to prepare it for use. Generally such cost includes costs that would be capitalized under

generally accepted accounting principles. For example, in addition to the purchase price, historical cost would include architectural fees, consulting fees, and related legal fees. * *"

the allowance for depreciation of assets acquired through *donation*. For this reason, 42 C.F.R. § 405.415(b) has no bearing on the Hearing Officer's decision. Therefore, even if the Hearing Officer did ignore this regulation, doing so in no way made his decision inconsistent with the law, regulations, or general instructions.

Finally, BHI apparently misconstrued the Hearing Officer's reliance on section 806. The Hearing Officer did not base his decision on this section. The Hearing Officer recognized section 806 would literally apply only if plaintiff had received actual payments from Webb; he only relied upon it as tangential support for the decision he had already reached. In addition, his decision, even without any reference to section 806, was correct under the Manual and applicable law and regulations. Mention of section 806 thus did not make the Hearing Officer's decision inconsistent with the law, regulations, or general instructions.

In sum, BHI's objections to the Hearing Officer's first decision in no way make this decision inconsistent with the law, regulations, or general instructions. Since these were the only objections made by BHI, and we have on our own found no objections, we hold this decision was consistent with the law, regulations, and general instructions. We, therefore, set aside the second decision and reinstate the first. Thus, plaintiff should have been allowed to include in basis the $550,055.64 donation received from Webb, increasing plaintiff's reasonable costs and also its Medicare reimbursements by $18,335.35 for 1971 and $26,586.53 for 1972.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied. Plaintiff's Medicare reimbursement is increased by $18,335.35 for its fiscal year 1971 and by $26,586.53 for its fiscal year 1972. Judgment is therefore entered for plaintiff in the amount of $44,921.88.